**Matthew Allen HUNT, a Minor, by Donna Wright HUNT, his Mother and Next Friend,**

v.

**HOFFMANN–LA ROCHE, INC., et al.**

**Civ. A. JFM–90–2368.**

United States District Court,
D. Maryland.

Jan. 30, 1992.

Thomas Rogers, Ness, Motley, Loadholt, Richardson & Poole, Charleston, S.C., R. Martin Palmer, Jr., Hagerstown, Md., for plaintiff.

Lawrence Stein, Fern O'Brian, Arnold & Porter, Washington, D.C., for defendants.

MEMORANDUM

MOTZ, District Judge.

This is a pharmaceutical product liability action brought by Matthew Allen Hunt, a minor, against Hoffmann–La Roche, Inc. ("Roche").[1] Plaintiff suffers from certain

---

1. Plaintiff has also named as a defendant F. Hoffmann–La Roche, Ltd. ("Hoffmann–La Roche"), Roche's Swiss affiliate. Hoffmann–La Roche has filed a motion to dismiss for lack of personal jurisdiction. By agreement of the parties, I have deferred ruling upon that motion until deciding Roche's summary judgment motion since, assuming that Hoffmann–La Roche

birth defects apparently caused by his mother's ingestion of Accutane, a prescription drug manufactured and distributed by Roche. The theory of plaintiff's case is that Roche failed to provide adequate warnings concerning Accutane's potential teratogenicity, that is its potential to cause birth defects. Roche has moved for summary judgment.[2]

## I.

Accutane is indicated for the treatment of severe recalcitrant cystic acne. It was first marketed in the United States by Roche in 1982. Animal testing had established its potential teratogenicity, and it has always been reserved for patients with severe cystic acne who are not responsive to conventional therapy. Because it is a prescription drug, it can be used only at the direction of a licensed physician.

Plaintiff was born on March 29, 1985. Approximately eight months before, on July 26, 1984, plaintiff's mother, Donna Wright Hunt, visited Dr. Charles Van Meter, a board-certified dermatologist for treatment of acne. Dr. Van Meter determined that Ms. Hunt was suffering from severe recalcitrant cystic acne and discussed with her the possibility of prescribing Accutane. Dr. Van Meter and Ms. Hunt have both testified on deposition that Dr. Van Meter told her that Accutane could cause birth defects and that she must not take if she was pregnant. It is also undisputed that Dr. Van Meter gave Ms. Hunt a current Accutane Patient Information Brochure containing the following warnings:

### Warning to Female Patients

You should not take Accutane if you are or may become pregnant during therapy.

Severe human birth defects are known to occur in women taking Accutane during pregnancy. The possibility that you may be pregnant should be ruled out by you and your doctor before starting Accutane therapy. An effective form of contraception (birth control) should be discussed with your doctor and used for one month before, during and used for one month after Accutane therapy. Should you unintentionally become pregnant, immediately stop taking Accutane and call your doctor.

\* \* \* \* \* \*

### Before Treatment

\* \* \* \* \* \*

\* For females—Accutane should not be taken until you are sure you are not pregnant and you are using an effective form of contraception for at least one month before beginning Accutane therapy.

It is strongly recommended that you have a pregnancy test within two weeks before Accutane therapy.

\* \* \* \* \* \*

### After Treatment

\* Females should continue using an effective form of contraception for one month following the discontinuation of Accutane.

Ms. Hunt has testified that she read these warnings while at home and understood "that if you were pregnant, you don't take the drug."

Dr. Van Meter did not perform a pregnancy test on Ms. Hunt. There is a dispute between them (which, as discussed *infra,* is not material to the resolution of this case) concerning the nature and extent of their

---

is subject to personal jurisdiction, its liability can be no greater than that of Roche.

**2.** Roche has also filed a motion to strike portions of an affidavit of Dr. Peter Elias in opposition to Roche's summary judgment motion. Because I do not find that Elias' affidavit is sufficient to defeat Roche's motion, I need not decide the motion to strike. However, perhaps I should note (in the event that my summary judgment ruling is reversed on appeal) that I would probably not strike any portions of the affidavit. Although I agree with Roche that

Elias was not properly designated as an expert, I believe that if Roche's summary judgment motion were denied on the basis of the affidavit, the appropriate sanction would be to require plaintiff to pay Roche's reasonable attorneys' fees and costs in seeking summary judgment. As to Roche's arguments concerning Dr. Elias' alleged lack of expertise and inconsistencies between his affidavit and prior testimony which he has given, I am inclined to believe that they go to the weight rather than the admissibility of his testimony.

conversations leading to the doctor's decision not to perform such a test.[3] Ms. Hunt recalls having told Dr. Van Meter that she was sexually active with her boyfriend at the time, David Hunt, that they were using condoms and that she intended to consult her gynecologist about alternative birth control measures. She further indicated that in the meantime, while she was using Accutane, she would practice abstinence. According to her recollection, Dr. Van Meter asked her if she were pregnant and she answered "not that I know of."

Dr. Van Meter's recollection is quite different. He remembers that he was very firm and specific in the warning which he gave to Ms. Hunt. According to him,

I asked her, I told her initially that this drug was new, that it was a dangerous drug, that we were just beginning to use it, and I told her what it could do for her. She was very excited about the drug and I emphasized to her that the drug was associated with birth defects and that that was the main and only significant problem that I was concerned about at that time, and that all doctors were concerned about, and that if she took the drug, if she were pregnant or if she had gotten pregnant on it, at which point I asked her if she was sexually active, and she said no. And I said if she became sexually active it was important, very important to practice a form of contraception, and she shook her head. And I told her that the birth defects, there wasn't a lot of information concerning what they were, but there was no question that they did cause birth defects.

Further, Dr. Van Meter recalls that Ms. Hunt "said she was not sexually active and she wasn't pregnant, and she didn't indicate to me she had a boyfriend."

Dr. Van Meter also states that he had read a number of articles and medical literature which alerted him to the possible side effects of Accutane. These articles specifically refer to the drug's potential teratogenicity. Furthermore, Dr. Van Meter testified that at the time that he prescribed Accutane to Ms. Hunt he had in his office a current copy of the *Physicians' Desk Reference* (the "PDR")—the medical profession's standard reference work on prescription drugs. The relevant language from the PDR then in effect stated:

CONTRAINDICATIONS: Patients who are pregnant or who intend to become pregnant while undergoing treatment must not receive Accutane.

There are no adequate and well-controlled studies in pregnant women, but major fetal abnormalities related to Accutane administration have been reported, including hydrocephalus, microcephaly and abnormalities of the external ear (micropinna, small or absent external auditory canals).

Women of childbearing potential should not be given Accutane until pregnancy is excluded and an effective form of contraception is used. They should be fully counseled on the potential risk to the fetus should they become pregnant while undergoing treatment. If pregnancy does occur during treatment, the physician and patient should discuss the desirability of continuing the pregnancy.

Teratogenicity was observed in rats at a dose of isotretinoin of 150 mg/kg/day, and included microcephaly, exencephaly, spina bifida, cleft palate and abnormalities of the external ear. In rabbits a dose of 10 mg/kg/day was embryotoxic and teratogenic (primarily skeletal abnormalities) and induced abortion.

WARNINGS: Because abnormalities of the human fetus have been reported, it is recommended that contraception be continued for one month or until a normal menstrual period has occurred following discontinuation of Accutane therapy.

\* \* \* \* \* \*

PRECAUTIONS: INFORMATION FOR PATIENTS:

\* \* \* \* \* \*

Women of childbearing potential should be instructed that they must not be pregnant when Accutane therapy is initiated, and that they should use an effective form of contraception while taking Accutane and for one month after Accutane has been stopped. (See CONTRAINDICATIONS and WARNINGS.)

3. Ms. Hunt has filed a medical malpractice claim against Dr. Van Meter.

## II.

The substance of plaintiff's position, as stated in the complaint and in the memorandum opposing summary judgment, is that "Roche was negligent in failing to require a mandatory pregnancy test of all female patients of childbearing potential prior to commencing therapy." Conceding that Roche does not have the authority to dictate to physicians how they should practice medicine,[4] at oral argument plaintiff's counsel articulated his position in terms of Roche's alleged failure to provide adequate warning about the dangers of Accutane. He now contends that Roche's warning should have specifically stated that Accutane must not be prescribed unless a pregnancy test has been conducted to exclude the possibility that the patient is pregnant.

Plaintiff's position is without merit. Ms. Hunt's deposition testimony makes it clear that she was herself fully advised, by the warning included in Roche's product brochure and by what Dr. Van Meter told her, that Accutane could cause birth defects in a child born to a woman using Accutane during her pregnancy. More to the point, it is beyond doubt that Dr. Van Meter was fully aware of the potential teratogenicity of Accutane and of the necessity of excluding pregnancy before prescribing it. That fact alone is dispositive. The parties agree that Maryland law is controlling here, and the Maryland courts have adopted the "learned intermediary" rule under which a manufacturer of a prescription drug has a duty to warn only physicians, not patients, of potential risks associated with the use of the drug. *See Nolan v. Dillon,* 261 Md. 516, 276 A.2d 36, 40 (1971); *Doe v. Miles Laboratories, Inc.,* 927 F.2d 187, 194 (4th Cir.1991); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 94–95 (D.Md.1989), *aff'd,* 898 F.2d 146 (4th Cir.1990).

The substance of the communications between Ms. Hunt and Dr. Van Meter concerning her possible pregnancy and the question of whether Dr. Van Meter met the governing standard of care by "excluding pregnancy" without conducting a pregnancy test are issues which must be resolved during the course of plaintiff's medical malpractice proceeding against the doctor. They are not germane here, however. According to Dr. Van Meter's own testimony (as well as the testimony of Ms. Hunt herself), he knew of the risk which Accutane posed to unborn babies and of the necessity of excluding pregnancy (by whatever means he deemed proper) before prescribing the drug. Therefore, Roche undisputably met its duty to warn Dr. Van Meter of the risks associated with Accutane.[5]

For these reasons, Roche's motion for summary judgment will be granted.

---

4. Dr. Elias, whom plaintiff now proffers as his expert, has so testified on deposition in another Accutane case.

5. Roche has also argued that because Dr. Van Meter was aware of the requirement that he exclude pregnancy, plaintiff has failed to prove that the alleged lack of an adequate warning was a proximate cause of plaintiff's injuries. If it were necessary for me to reach this question, I would find that the record is not sufficiently developed for me to rule now. Dr. Van Meter has not been deposed in this litigation but only in the malpractice action against him. In that deposition he did not testify (at least in the excerpts which have been provided to me) as to whether or not he would have conducted a pregnancy test if Roche's warning had specifically stated that such a test must be conducted. In my view that is the critical fact with respect to the issue of proximate cause.