[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13086

_____

CHUNHONG JIA,
NAIHAN LI,
NAIROU LI,
SHULEI WANG,
LIZHONG YAO,
WEIWEI ZHANG, and
CHONG ZHAO,

Plaintiffs–Appellants,

MIN WANG,
a.k.a. Lili Wang, et al.,

Third Party Defendants,

*versus*

BOARDWALK FRESH BURGERS & FRIES, INC. and
DAVID DIFERDINANDO,

Defendants–Third Party Plaintiffs–Appellees.

_____

Appeal from the United States District Court

for the Middle District of Florida
D.C. Docket No. 8:19-cv-02527

_____

Before BRANCH and LUCK, Circuit Judges, and SANDS,* District Judge.

SANDS, District Judge:

Appellants, Chunhong Jia, Naihan Li, Nairuo Li, Shulei Wang, Lizhong Yao, Weiwei Zhang, and Chong Zhao, are citizens and residents of the People's Republic of China. The individual Appellants, where appropriate, are referred to herein as follows: Chunhong Jia ("C. Jia"), "Naihan Li," "Nairuo Li," Shulei Wang ("S. Wang"), Lizhong Yao ("L. Yao"), Weiwei Zhang ("W. Zhang"), and Chong Zhao ("C. Zhao"). The Appellees, Defendants in the underlying case, are Boardwalk Fresh Burgers & Fries, Inc. ("Boardwalk Fresh") and its President and CEO, David DiFerdinando ("DiFerdinando," and together with Boardwalk Fresh, the "Boardwalk Defendants").

Appellants sought to lawfully obtain permanent resident status in the United States under the EB-5 Immigrant Investor Program (the "EB-5 Program"). In accordance with the EB-5 Program requirements, each Appellant submitted an I-526 petition to the United States Citizenship & Immigration Service ("Immigration Service"), and each Appellant invested $500,000 in a new

_____

* Honorable W. Louis Sands, United States District Judge for the Middle District of Georgia, sitting by designation.

commercial enterprise that would bring new jobs to United States citizens. Specifically, Appellants invested their money in Boardwalk Fries Opportunities, L.P. ("Boardwalk Fries Opportunities"), which was the operating entity of the new commercial enterprise that was supposed to open ten new Boardwalk Fresh franchises. Unfortunately, Appellants' $3.5 million investment was misappropriated, the new commercial enterprise failed, and Appellants did not receive their permanent resident status.

Prior to filing the instant action against the Boardwalk Defendants, Appellants filed actions against other parties whom Appellants alleged were responsible for the loss of their investments. Those other parties were allegedly involved in setting up and organizing the various entities comprising the new commercial enterprise and in soliciting investors, including Appellants, to invest in Boardwalk Fries Opportunities. However, Appellants' legal actions were thwarted when several of those other parties filed bankruptcy.

On October 11, 2019, Appellants filed this action in the district court against the Boardwalk Defendants asserting that the Boardwalk Defendants were responsible for Appellants' losses. On October 5, 2020, Appellants filed their operative Third Amended Complaint ("Complaint") alleging claims against the Boardwalk Defendants for fraud, negligent misrepresentation, federal securities law violations, breach of contract, breach of fiduciary duty, constructive fraud, negligence, gross negligence, unjust

enrichment/quantum meruit, conversion, civil conspiracy, and various aiding and abetting claims.

The Boardwalk Defendants filed a motion for summary judgment as to all fifteen claims which the district court granted. Appellants appealed the district court's decision as to the following nine claims: fraud, negligent misrepresentation, federal securities law violations, breach of contract, breach of fiduciary duty, constructive fraud, negligence, gross negligence, and unjust enrichment/quantum meruit.

In its ruling on the claims appealed, the district court found that Appellants failed to establish an essential element as to each claim. With respect to Appellants' claims for fraud, negligent misrepresentation, and federal securities law violations, the district court found that these claims were based solely on an affidavit executed by DiFerdinando, and that Appellants failed to present evidence of their reliance on representations allegedly contained in the affidavit. As to Appellants' claim for breach of contract, the district court found that Appellants failed to present evidence of the essential element of the existence of a contract between the Boardwalk Defendants and Appellants. Appellants' breach of fiduciary duty, constructive fraud, negligence, and gross negligence claims failed because the district court found that Appellants failed to present evidence of the essential element of each claim that the Boardwalk Defendants owed a duty to Appellants. Finally, as to their claim for unjust enrichment/quantum meruit, the district court found that Appellants failed to present evidence of the

necessary element that the Boardwalk Defendants received a benefit from Appellants.

After careful review, and with the benefit of oral argument, we **affirm**.

## I.   FACTUAL BACKGROUND

Boardwalk Fresh has been in existence since 1981 and is a franchisor of fast-food casual restaurants in the United States and worldwide. DiFerdinando is President of Boardwalk Fresh, and he and one of his brothers, who is not a party to this action, hold the controlling interest in Boardwalk Fresh.

In 2013, DiFerdinando was contacted by an individual, Terry Chan, who was interested in becoming a sub-franchisor to market Boardwalk Fresh franchises. Specifically, Terry Chan, with the assistance of his wife, Jacquelyn Chan, and Gary Chan (collectively, the "Chans"), planned to develop Boardwalk Fresh franchises in Ohio and Pennsylvania by raising money through Chinese investors who wanted to take advantage of the EB-5 Program. At that time, DiFerdinando did not have experience with the EB-5 Program.

In February 2014, Boardwalk Fresh entered into a sub-franchisor agreement with Jardin Hill, LLC, an entity owned and operated by one or more of the Chans. Boardwalk Fresh's sub-franchisor fee was $300,000. In addition, Jardin Hill planned to purchase and operate a Boardwalk Fresh franchise. Boardwalk Fresh's franchisee fee for that franchise was $30,000. So to complete the sub-

franchisor and first franchisee agreements, Jardin Hill was obligated to pay Boardwalk Fresh a total of $330,000. Appellants were not parties to the Jardin Hill/Boardwalk Fresh sub-franchisor or franchisee agreements.

Terry Chan told DiFerdinando that it takes one to two years to get investors through the EB-5 Program application process. Further, the EB-5 Program required each investor's contribution to a new commercial enterprise be placed in an escrow account, and such contribution could not be released until the investor's initial petition (I-526 petition) under the EB-5 Program was approved by the Immigration Service. Terry Chan told DiFerdinando that Jardin Hill's sub-franchisor fee and franchise fee (total of $330,000) would be paid after the investors' escrowed funds were released. Thus, DiFerdinando was not expecting to be involved in the new commercial enterprise until after the release of the investors' escrows, at which time DiFerdinando would assist Terry Chan in finding locations for the new Boardwalk Fresh franchise restaurants.

Even before the sub-franchisor agreement between Jardin Hill and Boardwalk Fresh was executed, the Chans began forming the entities that would comprise the new commercial enterprise. With the exception of our addition of Archway Partners, LLC ("Archway"), another entity owned by one or more of the Chans, the following diagram, titled Organizational Structure, was included in the solicitation materials provided to the investors.



Contrary to the Organizational Structure diagram, only three of the entities necessary for the new commercial enterprise were formed. Those entities were formed under the laws of the State of Ohio, and Gary Chan signed the organizational documents filed with the Ohio Secretary of State for those three entities on the dates and for the purposes noted below:

1.    Boardwalk Fries Opportunities was formed on November 25, 2013, to serve as the operating entity of the new commercial enterprise, and was the entity in which each Appellant ultimately invested $500,000 in exchange for a limited partnership interest therein. As reflected in the diagram, Boardwalk Fries

Opportunities was to be the sole owner of the ten job-creating entities that would be franchisees of Boardwalk Fresh.

2.     BWF MGMT, LLC ("BWF MGMT") was formed on November 25, 2013, to serve as the general partner of Boardwalk Fries Opportunities.

3.     Boardwalk Fries, LLC was not formed until November 5, 2015, almost two years after Boardwalk Fries Opportunities and BWF MGMT.  Boardwalk Fries, LLC was to be the managing member of BWF MGMT and was also to serve as the manager of Boardwalk Fries Opportunities.

Although not shown in the diagram presented to the investors, Archway was also a member of BWF MGMT.  Archway played a significant role in the new commercial enterprise; *i.e.*, Archway's main function was to manage the EB-5 Program aspects for Boardwalk Fries Opportunities.

Also conspicuously absent from the organizational chart and the disclosures provided to investors was any information relating to the ownership of the managing entity—Boardwalk Fries, LLC.  Neither DiFerdinando nor Boardwalk Fresh are shown as having any ownership interest or control over any of these core entities comprising the new commercial enterprise.

According to DiFerdinando, he played no part in determining the structure of, or in the organization of, the new commercial enterprise.  However, as noted, the ten job-creating entities were supposed to open Boardwalk Fresh restaurants; and at the request of Gary and Terry Chan, DiFerdinando provided them with

information relating to the operations of Boardwalk Fresh. That information was included in the Boardwalk Fries Opportunities business plan ("Business Plan"), one of the solicitation documents provided to investors. In addition, on December 10, 2013, DiFerdinando signed several documents as an officer of Boardwalk Fries, LLC, the managing entity. As noted above, the documents forming Boardwalk Fries, LLC were not filed in the Ohio Secretary of State's Office until almost two years later, on November 5, 2015.

In particular, on December 10, 2013, DiFerdinando signed the Boardwalk Fries Opportunities Limited Partnership Agreement ("LPA") in which BWF MGMT acted as both the general partner and as the initial limited partner. Boardwalk Fries, LLC and Archway, in their capacities as the members of BWF MGMT, executed the LPA on behalf of BWF MGMT. DiFerdinando signed the agreement as "pres" of Boardwalk Fries, LLC, and Gary Chan signed as "Authorized Signatory" of Archway.

Pursuant to its LPA, Boardwalk Fries Opportunities was supposed to be capitalized with a total of $9 million—$3 million to be contributed by BWF MGMT and $6 million to be contributed by twelve limited partners at $500,000 each. The seven Appellants were the only limited partners who ultimately invested in Boardwalk Fries Opportunities.

On January 17, 2014, DiFerdinando signed an Affidavit stating:

> David DiFerdinando, in conjunction with, by and/or through Boardwalk Fresh Burgers & Fries, Boardwalk

Fries, D's Inc[.,] or other affiliated companies and partners, commit to contributing the sum of USD Three Million ($3,000,000) to Boardwalk Fries Opportunities, L.P. via BWF MGMT, LLC, its General Partner.

Although he did not recall signing the Affidavit, DiFerdinando acknowledged that he must have done so because the Affidavit was notarized by his assistant, Patricia Lang ("P. Lang"). Appellants assert that through this Affidavit, the Boardwalk Defendants agreed to personally provide the $3 million capital contribution to Boardwalk Fries Opportunities.

DiFerdinando's recollection of discussions he had with Terry Chan regarding DiFerdinando or Boardwalk Fresh contributing $3 million in capital to Boardwalk Fries Opportunities was that DiFerdinando told Terry Chan that they did not fund franchise locations and that their business financials could not support a $3 million loan. However, DiFerdinando suggested that the $3 million could be raised through tenant allowances with landlords. Regardless, it is undisputed that DiFerdinando did not personally provide $3 million in cash to BWF MGMT. Nor does the record show that BWF MGMT satisfied its general partner capital contribution obligation through any other source.

Also on December 10, 2013, Boardwalk Fries, LLC and BWF MGMT entered into an Operations Management Agreement ("Management Agreement"). Therein, Boardwalk Fries, LLC agreed to assist BWF MGMT with the management and operation of all matters involving the administration, accounting,

compliance, and operation of the restaurants that Boardwalk Fries Opportunities was to own. DiFerdinando signed the Management Agreement as an authorized officer of Boardwalk Fries, LLC, in its defined role as manager of Boardwalk Fries Opportunities, and in Boardwalk Fries, LLC's role as a member of BWF MGMT.

To locate investors for Boardwalk Fries Opportunities, the Chan entities Jardin Hill and Archway entered into a letter of intent with New City Advisors, LLC ("NCA"), an entity owned by Min Wang aka Lili Wang ("L. Wang") and Xiaoyan Zhou ("X. Zhou").[1] NCA was organized in 2013 to provide advice and assistance to the sponsors—the individuals or companies intending to raise capital through the EB-5 Program—on how "best to put together an EB-5 project so that it may be successful." According to L. Wang, NCA's clients were exclusively the sponsors of the EB-5 projects on which NCA provided consulting services. NCA never represented the investors, and did not represent Appellants.

One of NCA's responsibilities in locating investors for Boardwalk Fries Opportunities was to act as a liaison between those investors and Boardwalk Fries Opportunities' sponsors as named in the letter of intent—Archway and Jardin Hill. As program manager, NCA "was responsible as like—as a sherpa, . . . to help [the investors] navigate . . . the EB-5 immigration process." Although L. Wang testified that NCA did not represent investors, the record reflects that Appellants communicated exclusively with NCA and

---

[1] Xiaoyan Zhou was referred to in various depositions as Xiao Yan Zhou, Karen Zhou, and Zo Xiou Yan. Herein we refer to Ms. Zhou as "X. Zhou."

its agents—and in particular X. Zhou. Further, several Appellants believed NCA was looking out for their best interests, and those Appellants relied on and trusted NCA exclusively with respect to their investment. For instance, X. Zhou was Naihan Li's only source of information, who stated that "I very much put my trust in [X. Zhou] at the time. So everything I learned was from [X. Zhou's] verbal introduction. So I signed the document [Subscription Agreement], but I did not understand them [*sic*]." C. Zhao admitted he did not read the documents presented to him for signature. Rather, he trusted X. Zhou so much that "anything she asked me to sign, I signed." C. Jia also testified that she trusted that NCA was working in her best interests, she relied on NCA's guidance, and she acted based on NCA's instructions with respect to the EB-5 process.[2]

Between January 27, 2014, and December 12, 2014, each Appellant became a limited partner of Boardwalk Fries Opportunities when they invested $500,000. It is uncontested that none of the Appellants communicated with DiFerdinando prior to investing in Boardwalk Fries Opportunities.[3] Appellants further concede that

---

[2] *Contra*, L. Yao Dep. 20:7–21:6; 26:9–27:2, DE 205 [hereinafter "L. Yao Dep."]; W. Zhang Dep. 17:9–18:10; 19:6–18; 23:2–6, DE 206 [hereinafter "W. Zhang Dep."]; S. Wang Dep. 12, DE 207 [hereinafter "S. Wang Dep."] (reflecting testimony of Appellants who relied on NCA very little and/or did their own review or research on the Boardwalk Fries Opportunities investment).

[3] *See* Naihan Li Dep. 14:22–15:2, DE 202 [hereinafter "Naihan Li Dep."]; Nairuo Li Dep. 22:25–23:3, DE 203 [hereinafter "Nairuo Li Dep."]; C. Zhao Dep. 15:23–16:2, DE 204 [hereinafter "C. Zhao Dep."]; L. Yao Dep. 13:23–14:2; W.

21-13086          Opinion of the Court          13

that they did not receive the DiFerdinando Affidavit directly from the Boardwalk Defendants.

As required by the EB-5 Program, each Appellant's $500,000 investment was placed in an individual escrow account which had been set up at U.S. Bank, N.A. Appellants contend, and DiFerdinando does not dispute, that DiFerdinando set up the escrow accounts.

According to Appellants, their I-526 petitions were approved in 2015, and Boardwalk Fresh issued a press release on December 7, 2015, stating that six of the Appellants' petitions had been approved by the Immigration Service. DiFerdinando recalled that a press release was sent out in December 2015, and acknowledged that Boardwalk Fresh would not have been paid the $300,000 Jardin Hill sub-franchisor fee in 2015 if the Appellants' I-526 petitions had not been approved. A copy of the press release was not attached to DiFerdinando's deposition nor to the Complaint. However, a copy of a December 7, 2015 Boardwalk Fresh press release stating that "one of its master franchisees in the Midwest had received six I-526 approvals" from the Immigration Service is attached as Exhibit L to the deposition of DiFerdinando's assistant, P. Lang.[4] We find that DiFerdinando's testimony together with a copy of the press

Zhang Dep. 19:6–18; S. Wang Dep. 18–19; C. Jia Dep. 14:21–15:7, DE 208 [hereinafter "C. Jia Dep."].

[4] P. Lang testified she was not familiar with the particular press release dated December 7, 2015, dealing with the approval of six I-526 petitions that was included in Exhibit L to her deposition.

release attached to P. Lang's deposition is consistent with Appellants' allegations, and it is reasonable to infer that Appellants' I-526 petitions were approved in 2015 prior to the release of Appellants' investments from their escrow accounts.

DiFerdinando signed a written authorization ("Escrow Authorization") addressed to U.S. Bank, as follows:

> The undersigned, BWF MGMT, LLC, an Ohio limited liability company, is the general partner of BOARDWALK FRIES OPPORTUNITIES, L.P., an Ohio limited partnership. The purpose of this letter is to advise that Gary Chan is authorized to sign documents, deposit funds and provide written direction and authorization on behalf of BOARDWALK FRIES OPPORTUNITIES, L.P., as the "Issuer Representative" for all purposes concerning the Master Escrow Agreement. Please contact the undersigned if you need anything further concerning this matter.

According to Appellants, the Escrow Authorization permitted Gary Chan to have unfettered access to Appellants' escrow accounts and opened the door for Gary Chan to drain their escrow accounts and abscond with their funds.

DiFerdinando acknowledged his signature on the Escrow Authorization and that it authorized Gary Chan to sign documents and deposit funds on behalf of Boardwalk Fries Opportunities. However, DiFerdinando testified that he did not know whose money was held in the escrow account(s) referred to in the Escrow Authorization.

Appellants allege that on October 10, 2015, Gary Chan transferred $450,000 from each Appellant's U.S. Bank escrow account into Boardwalk Fries Opportunities' bank account located at GE Credit Union ("GECU"). Per Appellants, Gary Chan later transferred the remaining $50,000 from each Appellant's U.S. Bank escrow account into Boardwalk Fries Opportunities' GECU account. Finally, Appellants contend that on February 12, 2018, GECU notified Appellants that Boardwalk Fries Opportunities' bank accounts held no funds on deposit.

The Boardwalk Defendants do not contest the facts as alleged by Appellants that Gary Chan transferred the funds from Appellants' escrow accounts to Boardwalk Fries Opportunities' account at GECU. However, the Boardwalk Defendants deny that they had any knowledge, until 2018, that Gary Chan, or any of the Chans, had diverted Appellants' funds for the Chans' own use.

The record further reflects that on or about November 3, 2015, Jardin Hill paid Boardwalk Fresh the $330,000 fee for the subfranchisor and franchisee agreements the parties had entered into in 2014.

## II.  PROCEDURAL HISTORY

This is the latest effort by Appellants to recover their lost investments from the various parties they contend defrauded them. After Appellants brought this action against them, the Boardwalk Defendants filed a third-party complaint against NCA and L. Wang

(the "New City Defendants").[5]  The Boardwalk Defendants asserted that the New City Defendants, rather than the Boardwalk Defendants, were responsible for Appellants' losses.  After resolution of the New City Defendants' motions to dismiss, the Boardwalk Defendants retained a third-party claim for contribution against the New City Defendants.  Thereafter, the Boardwalk Defendants and New City Defendants filed their dispositive motions.  Those parties also sought a determination of whether Florida, Maryland, or Ohio law applied to the state law tort claims filed against the Boardwalk Defendants.

As previously noted, the district court granted the Boardwalk Defendants' motion for summary judgment as to all fifteen claims.  The district court denied the New City Defendants' motion for summary judgment.  However, because Appellants' Complaint was dismissed upon the district court granting the Boardwalk Defendants' summary judgment, the district court also dismissed the Boardwalk Defendants' third-party complaint as moot.

Appellants timely appealed the district court's order as to the following nine claims, which are addressed below in the following order:

    A. Fraud (Count I) and negligent misrepresentation (Count XV);

    B. Federal securities law violations (Count IX);

    C. Breach of contract (Count II);

---

[5] Other parties named as third-party defendants are not relevant to this appeal.

D. Breach of fiduciary duty (Count III) and constructive fraud (Count XIII);

E. Negligence (Count IV) and gross negligence (Count V); and

F. Unjust enrichment/quantum meruit (Count VII).

The Boardwalk Defendants did not appeal the dismissal of their third-party complaint. Thus, the New City Defendants are not parties to this appeal.

As to the choice of law disputes with respect to the claims appealed, the district court found that Maryland law applied to Appellants' claims for fraud and negligent misrepresentation. The court further found that Ohio law applied to the remaining state law claims for breach of contract, breach of fiduciary duty, negligence, gross negligence, unjust enrichment/quantum meruit, and constructive fraud.

Appellants have not appealed the district court's choice-of-law determinations and do not raise them in their brief, so we need not review the district court's choice-of-law analysis. Thus, herein, we adopt the district court's choice-of-law determinations.

## III. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, "view[ing] the evidence in the light most favorable to the non-moving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an

inference based on speculation and conjecture is not reasonable." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (internal quotation marks omitted).

Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant can meet its initial burden by demonstrating that the non-moving party has failed to present evidence in support of an element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

We note here that there are multiple instances in which Appellants attempt to raise arguments in this appeal which were not presented to the district court. "This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (citations and internal quotation marks omitted). Below, we identify these new arguments in our discussion of the claims to which such arguments relate. However, consistent with our practice, we decline to consider Appellants' new arguments raised for the first time on appeal.

## IV. DISCUSSION

### A. Fraud (Count I) and Negligent Misrepresentation (Count XV)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on Appellants' fraud and negligent misrepresentation claims.

To prevail on a claim for fraud under applicable Maryland law, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008); *Crystal v. Midatlantic Cardiovascular Assocs., P.A.*, 133 A.3d 1198, 1204 (Md. Ct. Spec. App. 2016). Each element must be proven by clear and convincing evidence. *Gourdine*, 955 A.2d at 791. "Clearly, in order to sustain a cause of action based on fraud or deceit, the defendant must have made a false representation *to the person defrauded*." *Id*. (emphasis in original). Similar to the elements of fraud, negligent misrepresentation under Maryland law requires the plaintiff to prove that:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement;

(2) the defendant intended that his statement would be acted upon by the plaintiff;

(3) the defendant had knowledge that the plaintiff would probably rely on the statement, which, if erroneous, would cause loss or injury;

(4) the plaintiff, justifiably, took action in reliance on the statement; and

(5) the plaintiff suffered damage proximately caused by the defendant's negligence.

*Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (alterations adopted) (citing *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982)). "Ordinarily . . . the representation must be definite, and mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements." *Id.* (quoting *Fowler v. Benton*, 185 A.2d 344, 349 (Md. 1962)).

Appellants alleged the Boardwalk Defendants supplied Appellants with the Affidavit containing the false promise to contribute $3 million to Boardwalk Fries Opportunities with the intent to lure Appellants into making an investment. Appellants further alleged that they would not have invested in Boardwalk Fries Opportunities but for DiFerdinando's commitment.

Appellants' fraud and negligent misrepresentation claims are based solely on the alleged representation in the Affidavit, and

the district court did not err in finding that Appellants failed to present evidence of their reliance on the Affidavit. The record is clear that prior to investing in Boardwalk Fries Opportunities, none of the Appellants communicated directly with DiFerdinando. Appellants concede that the Affidavit was not provided to them directly by the Boardwalk Defendants.

Instead, Appellants argue that they received copies of a translated version of the Affidavit from NCA via L. Wang. Noting that L. Wang could only speculate as to whether Appellants read or reviewed the Affidavit, the district court found that regardless of whether Appellants received the translated Affidavit, Appellants still failed to provide evidence that they had read or reviewed the Affidavit prior to investing. Thus, the court concluded that Appellants failed to show reasonable reliance thereon.

Appellants attempt to circumvent the lack of evidence showing they personally read or reviewed the Affidavit prior to investing by arguing that L. Wang and NCA acted as a dual agent for Boardwalk Fries Opportunities and Appellants. Thus, since L. Wang was acting as their agent, Appellants now argue that transmission of the Affidavit to L. Wang was, "as a matter of law," as good as giving it to Appellants directly. Appellants are ignoring L. Wang's testimony that NCA did not represent Appellants, and Appellants failed to point to evidence establishing such a relationship. More to the point, however, Appellants did not present the precise argument that an agency relationship existed among Appellants, NCA, and/or any of the entities comprising the new commercial

enterprise to the district court for consideration.  We decline to consider this new argument for the first time on appeal.  *Access Now*, 385 F.3d at 1331.

Finally, Appellants' assertion that they were aware of DiFerdinando's alleged promise to contribute $3 million in cash to the project through other organizational and/or solicitation documents is unpersuasive.  The language in other documents obligated the general partner, *BWF MGMT*, to make a $3 million capital contribution.  Thus, to tie the Boardwalk Defendants to BWF MGMT's $3 million obligation, Appellants would still have had to read and rely on DiFerdinando's Affidavit prior to investing—which all agree they did not do.[6]

In any case, evidence of reliance on the Affidavit was essential to Appellants' fraud and negligent misrepresentation claims.  Because Appellants failed to present sufficient evidence raising a genuine issue of material fact as to their reliance on DiFerdinando's Affidavit, the district court did not err in granting summary judgment in favor of the Boardwalk Defendants on Appellants' fraud and negligent misrepresentation claims (Counts I and XV).

---

[6] While not necessary to or controlling our opinion, we note the Affidavit, on its face, does not state that DiFerdinando would personally contribute $3 million to BWF MGMT.  *See supra* text quoting Affidavit pp. 9–10.

21-13086              Opinion of the Court                    23

### B. Federal Securities Law Violations (Count IX)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on S. Wang's and L. Yao's ("SEC Appellants") claims for violations of federal securities law.

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered . . . or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). "SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (citation and internal quotation marks omitted).

"Investments in EB-5 projects are subject to the federal securities laws." *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 77 (2020). The Supreme Court has "implied a private cause of action from the text and purpose of § 10(b)." *Matrixx Initiatives*, 563 U.S. at 37. To prevail on their federal securities violations claim against the Boardwalk Defendants, the SEC Appellants must prove "(1) a material misrepresentation or omission by the [Boardwalk Defendants]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id*. at 37–38 (internal quotation marks omitted).

> "Reliance," [the Supreme Court has] explained, is an essential element of the § 10(b) private cause of action because proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury. The traditional (and most direct) way for a plaintiff to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation.

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013) (citations and internal quotation marks omitted).

To support their federal securities law violations claim, the SEC Appellants present the same arguments and evidence presented in support of Appellants' fraud and negligent misrepresentation claims. We have already found that Appellants failed to present any evidence that they relied on the DiFerdinando Affidavit.

Reliance is an essential element of a § 10(b) private cause of action alleging federal securities law violations. Because the SEC Appellants failed to present sufficient evidence raising a genuine issue of a material fact as to their reliance on DiFerdinando's Affidavit, the district court did not err in granting summary judgment in favor of the Boardwalk Defendants on the SEC Appellants' claim for federal securities law violations (Count IX).

### C. Breach of Contract (Count II)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on Appellants' breach of contract claim.

Ohio law governs the validity of the Boardwalk Fries Opportunities LPA, the construction of its terms, and the interpretation of the rights and duties of the partners.

To establish a claim for breach of contract under Ohio law, Appellants must prove the existence of a contract, performance by Appellants, breach by the Boardwalk Defendants, and damage or loss to Appellants. *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007). "It is axiomatic that those not a party to a contract cannot be held liable for a breach of contract." *Ingle-Barr, Inc. v. E. Loc. Sch. Dist. Bd.*, Nos. 10-CA-808, 10-CA-809, 2011 WL 441314, at *2 (Ohio. Ct. App. Jan. 27, 2011); *see also Ingle-Barr, Inc. v. Scioto Valley Loc. Sch. Dist. Bd.*, 953 N.E.2d 363, 365 (Ohio Ct. App. 2011) ("[T]he party with which Ingle-Barr contracted is the state of Ohio, and that is the party from which it must seek compensation for any breach of those contracts.").

Appellants concede that the Boardwalk Defendants were not parties to the Boardwalk Fries Opportunities LPA. Nevertheless, Appellants contend the Boardwalk Defendants can still be liable for breach of contract (i) because of the Boardwalk Defendants' direct conduct in participating in an alleged scheme with the Chans, or (ii) by piercing the corporate veil.

Appellants' "direct conduct" theory is that by signing the Boardwalk Fries Opportunities LPA and the Management Agreement on behalf of then-nonexistent Boardwalk Fries, LLC, DiFerdinando was in fact entering into the LPA for himself personally or on behalf of Boardwalk Fresh. Even though Appellants raised this argument below in support of their breach of fiduciary duty claim, they failed to raise it in support of their breach of contract claim. Accordingly, we decline to apply this argument to Appellants' breach of contract claim for the first time on appeal. *See Access Now*, 385 F.3d at 1331.

Appellants alternatively seek to hold the Boardwalk Defendants liable for BWF MGMT's and Boardwalk Fries Opportunities' alleged breaches of contract under a veil-piercing theory. Keeping in mind the organizational structure of the new commercial enterprise,[7] Appellants would need to pierce the veils of both Boardwalk Fries, LLC and BWF MGMT to hold the Boardwalk Defendants individually liable for BWF MGMT's alleged breaches of its duties as the general partner of Boardwalk Fries Opportunities.

"[A] limited liability company is subject to the same veil piercing test as a corporation." *Premier Therapy, LLC v. Childs*, 75 N.E.3d 692, 712 (Ohio Ct. App. 2016). The requirements a court must find before disregarding the entity form and holding individual shareholders or members liable for wrongs committed by the entity, are set out in two Ohio Supreme Court cases. *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075,

---

[7] *See supra* Organizational Structure diagram p. 7.

21-13086                Opinion of the Court                27

1086–87 (Ohio 1993), *holding modified by Dombroski v. WellPoint, Inc*., 895 N.E.2d 538, 545 (Ohio 2008).

Under *Belvedere* and *Dombroski*, the corporate veil can be pierced when (1) "control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own," *Belvedere*, 617 N.E.2d at 1086; (2) control over the corporation by those to be held liable was exercised "in such a manner as to commit fraud, an illegal act, or a similarly unlawful act[,]" *Dombroski*, 895 N.E.2d at 545; and (3) "injury or unjust loss resulted to the plaintiff from such control and wrong[,]" *Belvedere*, 617 N.E.2d at 1086.  All three prongs of the test must be met before piercing the veil is warranted.  *Dombroski*, 895 N.E.2d at 543.

The *Dombroski* court cautioned that the corporate veil should be pierced only in instances of extreme misconduct.  *Id*. at 545 (finding that a defendant insurer's bad faith is a straightforward tort, and an example of unjust conduct, but "it does not represent the type of exceptional wrong that piercing is designed to remedy").  The first prong of the *Belvedere/Dombroski* test "is known as the 'alter ego' doctrine, and it requires the plaintiff to show the individual and the [entity] are fundamentally indistinguishable." *Premier Therapy*, 75 N.E.3d at 716 (internal quotation marks omitted).[8]

---

[8] When assessing the first prong, the *Premier Therapy* court identified a non-exhaustive list of factors which courts can consider, including:

Before the district court, Appellants asserted that there was ample evidence in the record "to demonstrate that genuine issues of material fact exist[ed] to pierce the veil and get to Defendants." However, Appellants neglected to identify any such evidence. The district court correctly noted that Appellants bore the burden of demonstrating that piercing the veil was warranted, and that "[t]he Court need not scour through the vast record in this case to find evidence supporting [Appellants'] argument." The district court further noted that to the extent Appellants' argument for piercing the corporate veil was based on their fraud claims contained in Counts I, IX, and XV, those claims were resolved in the Boardwalk Defendants' favor. Accordingly, the district court determined that Appellants failed to meet their burden to show that piercing the veil was warranted, and granted the Boardwalk Defendants' motion for summary judgment as to Appellants' breach of contract claim.

---

(1) inadequate capitalization; (2) insolvency at the time of the disputed act; (3) the individual held himself out as personally liable for certain corporate obligations; (4) siphoning of funds or assets of the entity for personal expenditures or use; (5) the entity's inability to pay debts due to high salaries or loans to shareholders; [(6)] commingling of individual and entity funds; [(7)] disregard of corporate roles; [(8)] disregard of corporate formalities; [(9)] lack of corporate records, especially regarding claimed loans to or from the entity to be pierced; [(10)] common office space; [(11)] personnel; and [(12)] the degree of domination by the person to be held liable, e.g. where the corporation was a mere facade for the operations of the dominant shareholders.

75 N.E.3d at 716.

Here, Appellants have failed to satisfy the first prong of the *Belvedere/Dombroski* test. On appeal, Appellants rely upon the *Premier Therapy* factors to argue the Boardwalk Defendants exercised dominion and control over BWF MGMT and Boardwalk Fries, LLC to a degree sufficient to satisfy the first prong of the *Belvedere/Dombroski* test. Appellants now seek to do on appeal what they could have done, but failed to do, before the district court; *i.e.*, scour the record themselves for facts they allege create material factual disputes as to the elements necessary to warrant piercing the veils of Boardwalk Fries, LLC and BWF MGMT. Appellants point to alleged actions, or inactions, of the Boardwalk Defendants which Appellants argue show the Boardwalk Defendants exercised such complete control over BWF MGMT and/or Boardwalk Fries, LLC, that those entities had no separate existence. The majority of the evidence Appellants now present, as surmised by the district court, is based on Appellants' allegations of fraud contained in Counts I, IX and XV. We have already affirmed the district court's dismissal of such fraud claims. Appellants also identify other actions allegedly taken by the Boardwalk Defendants which Appellants contend support their veil-piercing theory to allow their breach of contract claim to go forward against the Boardwalk Defendants. Once again, we decline to consider these allegations, noted and pointed to for the first time on appeal. *See Access Now*, 385 F.3d at 1331.

Having determined that the district court did not err in finding that Appellants failed to present sufficient evidence to present a genuine issue of material fact as to the first prong of the *Belvedere/Dombroski* test, we need not consider the second or third

prongs. *Dombroski*, 895 N.E.2d at 543 (all three prongs of the test must be met before piercing the veil is warranted). As such, the district court did not err in finding that Appellants failed to meet their burden of proof to pierce the veils of BWF MGMT and/or Boardwalk Fries, LLC. And because Appellants failed to present sufficient evidence to justify holding the Boardwalk Defendants individually liable for the alleged contractual breaches here, the district court did not err in granting summary judgment to the Boardwalk Defendants on Appellants' breach of contract claim (Count II).

### D. Breach of Fiduciary Duty (Count III) and Constructive Fraud (Count XIII)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on Appellants' breach of fiduciary duty and constructive fraud claims.

Pursuant to the Boardwalk Fries Opportunities LPA's choice of law clause, Ohio law governs the duties of Boardwalk Fries Opportunities' partners. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Belvedere*, 617 N.E.2d at 1082 (citation and internal quotation marks omitted).

"The essential elements of a claim of breach of fiduciary duty are (1) the existence of a duty arising from a fiduciary relationship, (2) the failure to observe the duty, and (3) an injury resulting proximately therefrom." *Puhl v. U.S. Bank, N.A.*, 34 N.E.3d 530, 536 (Ohio Ct. App. 2015). Under Ohio law, the general partners of

a limited liability partnership owe a fiduciary duty to the limited partners.  Ohio Rev. Code Ann. § 1782.241.

Also, under Ohio law, "[a] fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed." *Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320, 323 (Ohio 1979); *see also Adorno v. Delgado*, No. 04CA008436, 2004 WL 2348158, at *2 (Ohio Ct. App. Oct. 20, 2004) ("A fiduciary relationship may be created either formally, by contract, or informally.").

The elements of a constructive fraud claim and those of a breach of fiduciary duty claim are very similar.  *Saxe v. Dlusky*, No. 09AP-673, 2010 WL 4324198, at *11 (Ohio Ct. App. Nov. 2, 2010). "Constructive fraud does not require fraudulent intent.  . . .  However, a constructive fraud claim does require the existence of some peculiar confidential relationship between the parties which affords the power and means to one to take undue advantage of or exercise under [*sic*] influence over another."  *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, Ltd.*, 476 F. Supp. 2d 809, 823 (S.D. Ohio 2007) (citations omitted).

Appellants are correct that Boardwalk Fries, LLC's organizational documents had not been filed with the Ohio Secretary of State when Boardwalk Fries, LLC signed the Boardwalk Fries Opportunities LPA on behalf of BWF MGMT.  Based on that fact, Appellants take a giant leap to an unsubstantiated "legal" conclusion that since Boardwalk Fries, LLC did not exist when DiFerdinando signed the LPA, then DiFerdinando signed the LPA in his personal

capacity and/or as an agent, officer, or employee of Boardwalk Fresh. Thus, Appellants conclude that at least one of the Boardwalk Defendants was the general partner of Boardwalk Fries Opportunities and, as such, owed a fiduciary duty to Appellants in their capacity as the limited partners of Boardwalk Fries Opportunities.

The district court found, and we agree, that Appellants did not present evidence to show that either Boardwalk Defendant was a general partner of Boardwalk Fries Opportunities. In considering Appellants' argument, the district court stated:

> Contrary to Plaintiffs' contention, they cite to no evidence that David DiFerdinando signed [the LPA] in his personal capacity, or that Boardwalk Fresh is in anyway [*sic*] bound by the agreement. And, even if Boardwalk Fries, LLC, "did not exist" when the partnership agreement was signed, Plaintiffs provide no authority for why the Boardwalk Defendants should be liable for BWF MGMT's conduct.

Here, Appellants still cite to no *evidence* in the record to support their position. They attempt to ignore or brush aside the fact that another entity—BWF MGMT—sat between the Boardwalk Defendants and Boardwalk Fries Opportunities. In response to the Boardwalk Defendants' argument below that Appellants had to pierce two corporate layers to get to the Boardwalk Defendants, Appellants stated they already had a judgment against BWF MGMT for breach of contract. Appellants obtained a default judgment against BWF MGMT for fraud, conversion, breach of

contract, breach of fiduciary duty, and gross negligence in the amount of $3.5 million.[9] However, the Boardwalk Defendants were not parties to that lawsuit. And Appellants have failed to provide authority explaining why the Boardwalk Defendants should be held individually liable for BWF MGMT's conduct. As the district court found, "[Appellants] admitted they had never spoken to the Boardwalk Defendants, and so it is unclear what sort of relationship—let alone a special relationship of trust or confidence—existed between them."

Again, in an effort to circumvent the district court's findings, Appellants put forward new arguments. First, L. Wang, as alleged agent for Appellants, communicated with the Boardwalk Defendants on Appellants' behalf. Second, Appellants argue that a fiduciary relationship exists between EB-5 investors and those operating and controlling the new commercial enterprise. We decline to consider these arguments raised for the first time on appeal. *Access Now*, 385 F.3d at 1331.

In sum, Appellants failed to present evidence sufficient to raise a genuine issue of material fact as to the existence of either a formal or informal fiduciary relationship between Appellants and the Boardwalk Defendants. Nor did Appellants present evidence sufficient to raise a genuine issue of material fact as to the existence of a confidential relationship between Appellants and the

---

[9] Appellants obtained the default judgment on July 29, 2019, in a case filed in the Court of Common Pleas, Hamilton County, Ohio, styled *Jia v. BWF MGMT, LLC*, No. A1900785. BWF MGMT was the only defendant in that case.

Boardwalk Defendants that would have given them the means to take undue advantage of or to exercise undue influence over Appellants. Accordingly, the district court properly granted summary judgment to the Boardwalk Defendants on Appellants' breach of fiduciary duty and constructive fraud claims (Counts III and XIII).

### E. Negligence (Count IV) and Gross Negligence (Count V)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on Appellants' negligence and gross negligence claims.

Appellants' negligence and gross negligence claims are governed by Ohio law, which applies the well-known standard that "[t]o recover on a claim for negligence, . . . the plaintiff must prove (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, and (3) the breach of the duty proximately caused the plaintiff's injury." *Vanderbilt v. Pier 27, LLC*, 2 N.E.3d 966, 970 (Ohio Ct. App. 2013) (citations omitted).

"Gross negligence is the 'failure to exercise any or very slight care' or the 'failure to exercise even that care which a careless person would use.'" *Bennett v. Biernacki*, 204 N.E.3d 39, 43 (Ohio Ct. App. 2022) (quoting *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 525 N.E.2d 761, 768 (Ohio 1988); *see also Vidovic v. Hoynes*, 29 N.E.3d 338, 348 (Ohio Ct. App. 2015) (a finding of gross negligence requires a showing of "willful and wanton conduct as well as the intentional failure to perform a duty in reckless disregard of the consequences as affecting the life or property of another." (internal

quotation marks omitted)). "'Wanton' misconduct is the failure to exercise any care whatsoever." *Vidovic*, 29 N.E.3d at 348 (citations omitted).

We have already addressed Appellants' myriad arguments that the Boardwalk Defendants were Boardwalk Fries Opportunities' general partners. Appellants failed to present sufficient (or any) evidence to raise a genuine issue of material fact as to this allegation. Thus, for purposes of this appeal, the Boardwalk Defendants were not shown to be general partners of Boardwalk Fries Opportunities, and the Boardwalk Defendants could not be shown to owe a duty to Appellants based on that theory.

According to Appellants, the Boardwalk Defendants owed Appellants "legal duties" which were established by the Management Agreement and the Business Plan. Again, Appellants failed to present evidence that the Boardwalk Defendants signed the Management Agreement in their individual capacities, or that either Boardwalk Defendant prepared, approved, or disseminated the Business Plan to Appellants.

Appellants further asserted that the Boardwalk Defendants breached an undefined "legal duty" owed to Appellants "by failing to safeguard [Appellants'] funds, use them for the purpose for which they were intended and allowing the Chans unlimited access to the U.S. Bank escrow accounts to convert [Appellants'] investment proceeds and use them for purposes for which they were never intended via the escrow release." Appellants contend that this "evidence" supports their claims of gross negligence because

of the Boardwalk Defendants' conscious disregard in allowing the Chans unfettered access to Appellants' funds without any of the controls or monitoring of the use of the funds vis-à-vis construction draws. We agree with the district court's determination that the Chans, not the Boardwalk Defendants, were responsible for the EB-5 Program aspects of the new commercial enterprise. In addition, Appellants failed to point to any evidence supporting their assertion that the Boardwalk Defendants had an obligation (or authority) to monitor the use of Boardwalk Fries Opportunities' capital.

Finally, Appellants argue that corporate officers can be held personally liable for tortious acts they commit while acting on behalf of the entity. While this may be true in certain instances, Appellants failed to provide any evidence of what tortious acts DiFerdinando is alleged to have committed in his role as president of Boardwalk Fries, LLC. In any event, Appellants' theory that DiFerdinando is liable to Appellants based on DiFerdinando's position as an officer of Boardwalk Fries, LLC, presents another argument that Appellants' could have raised before the district court, but failed to do so. We decline to consider this argument raised for the first time in Appellants' reply brief in this appeal. *Access Now*, 385 F.3d at 1331.

The district court did not err in finding that Appellants' negligence claim failed as a matter of law because (i) the Boardwalk Defendants were not general partners of Boardwalk Fries Opportunities, and (ii) Appellants did not cite to any other evidence

21-13086                Opinion of the Court                37

raising a genuine issue of material fact that the Boardwalk Defendants owed a duty of care to Appellants. Accordingly, the district court did not err in granting summary judgment to the Boardwalk Defendants on Appellants' negligence and gross negligence claims (Counts IV and V).

### F. Unjust Enrichment/Quantum Meruit (Count VII)

The district court properly granted summary judgment in the Boardwalk Defendants' favor on Appellants' unjust enrichment/quantum meruit claim.

Ohio law governs this claim.

> A claim of unjust enrichment is one of quasi contract founded upon the fundamental principle of justice that no one ought unjustly to enrich himself at the expense of another. The unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another. In order to find that defendants were unjustly enriched, thus justifying a contract implied in law, the evidence must clearly and convincingly show: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.

*Ohio Bureau of Workers' Comp.*, 476 F. Supp. 2d at 826 (citations and internal quotation marks omitted). "The plaintiff must confer the benefit as a response to fraud, misrepresentation, or bad faith on

behalf of the defendant." *Schlaegel v. Howell*, 42 N.E.3d 771, 782 (Ohio Ct. App. 2015) (citation and internal quotation marks omitted). A claim for quantum meruit contains the same elements as required for recovery under a claim for unjust enrichment. *Id*. at 781–82.

Appellants contend that a portion of their $3.5 million investment in Boardwalk Fries Opportunities was used to pay Jardin Hill's sub-franchisor and franchisee fees of $330,000 to Boardwalk Fresh. The record, however, reflects that the $330,000 deposited into Boardwalk Fresh's Wells Fargo bank account on November 3, 2015, came from *Jardin Hill's* bank account with First Financial.

The Boardwalk Defendants do not contest Appellants' allegations that Gary Chan transferred the funds from Appellants' U.S. Bank escrow accounts into Boardwalk Fries Opportunities' GECU account beginning in October 2015. Nor do they contest that as of February 2018, the balance in Boardwalk Fries Opportunities' GECU account was $0. However, Appellants pointed to no evidence tracing their investment out of Boardwalk Fries Opportunities' GECU account into any other entity's or individual's account(s) between October 2015 and February 2018. In fact, there is no specific evidence that funds were transferred from Boardwalk Fries Opportunities' GECU account into Jardin Hill's account. Thus, a critical link is missing to permit a reasonable inference that Appellants' U.S. Bank escrow accounts holding the funds they invested in Boardwalk Fries Opportunities were the source of the $330,000 transferred from Jardin Hill's First Financial Bank account

to Boardwalk Fresh's Wells Fargo account on November 3, 2015. Appellants' assertion is pure speculation. *See Ave. CLO Fund*, 723 F.3d at 1294 (an inference based on speculation and conjecture is not reasonable).

Appellants contend that DiFerdinando was aware that the $330,000 transferred into Boardwalk Fresh's bank account *could* have come from Appellants' escrowed funds. However, "could have" does not meet Appellants' burden to "clear[ly] and convinc-ing[ly]" show that the $330,000 deposit came from Appellants' escrowed funds such that Appellants conferred a benefit on the Boardwalk Defendants. *Est. of Cowling v. Est. of Cowling*, 847 N.E.2d 405, 411 (Ohio 2006). Appellants offered no other theories to show they conferred a benefit on the Boardwalk Defendants.

An essential element of Appellants' unjust enrichment/ quantum meruit claim is that Appellants must have conferred a benefit on the Boardwalk Defendants. *Id*. Because Appellants failed to present sufficient evidence raising a genuine dispute of material fact as to whether Appellants' escrowed funds were the source of Jardin Hill's $330,000 payment to Boardwalk Fresh, the district court did not err in granting summary judgment in favor of the Boardwalk Defendants on Appellants' unjust enrich-ment/quantum meruit claim (Count VII).

## V. CONCLUSION

Having found that the district court did not err in granting summary judgment to the Boardwalk Defendants on all claims ap-pealed, the district court's judgment is **AFFIRMED**.